# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 00-3235

———————

| | |
|---|---|
| Timothy Helseth, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * District of Minnesota. |
| John Burch, in his individual capacity, | * |
| | * |
| Defendant - Appellant, | * |
| | * |

———————

Submitted: January 11, 2001

Filed: July 31, 2001

———————

Before WOLLMAN, Chief Judge, McMILLIAN, RICHARD S. ARNOLD, BOWMAN, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, MURPHY, and BYE, Circuit Judges.

———————

LOKEN, Circuit Judge.

In County of Sacramento v. Lewis, 523 U.S. 833, 835 (1998), the Supreme Court held that "in a high-speed automobile chase aimed at apprehending a suspected offender . . . only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a [substantive] due process violation." In Feist v. Simonson, 222 F.3d 455, 464 (8th

Cir. 2000), which involved a high-speed pursuit of a stolen car, a panel of this court declined to apply the intent-to-harm standard of Lewis because the police officer "had ample time to deliberate" during the six-minute chase. In this case, an intoxicated driver seriously injured Timothy Helseth while being pursued at high speed by police officer John Burch. Relying on Feist, the district court denied Burch qualified immunity from Helseth's substantive due process claim under 42 U.S.C. § 1983. Helseth v. Burch, 109 F. Supp. 2d 1066, 1078 (D. Minn. 2000). Burch appealed, and we granted his petition for initial en banc review.[1] We overrule Feist and reverse.

## I. Background.

Shortly after midnight on August 22, 1995, an intoxicated Everett Contois raced his car on a straight stretch of road in Blaine, Minnesota, a Twin Cities suburb. Contois's car was traveling 111 mph when it passed Blaine police officer William Bott in his squad car. Bott began pursuit, activating his lights and siren and notifying the police dispatcher of the chase. After Contois had successfully evaded Bott for several miles, running stop signs and stoplights at speeds of 60 to 80 mph, he raced passed Burch, who joined the chase as the lead squad car.

With Burch in close pursuit, Contois drove through four stop signs, stopped briefly in a dead-end cul-de-sac, and then drove through two lawns and over a small retaining wall to another street. As Contois slowed to make a right turn, Burch attempted to stop the Contois vehicle with three Pursuit Intervention Tactics ("PIT") maneuvers, in which the officer drives alongside the rear of the fleeing vehicle, turns, and hits the vehicle's rear end, causing it to spin and stop. The third PIT spun

---

[1]The parties in Feist settled while the officer's petition for rehearing en banc was pending. The petition was then dismissed, with four judges dissenting. 222 F.3d at 465. Only the court sitting en banc may overrule the Feist panel decision. See United States v. Missouri Valley Constr. Co., 741 F.2d 1542, 1546 (8th Cir. 1984).

-2-

Contois's vehicle into a grassy median, but Contois quickly sped off, heading in the wrong direction on Highway 10, a heavily traveled thoroughfare. Another PIT maneuver again spun Contois into the median, but he re-entered Highway 10 (now heading in the right direction) and accelerated to speeds of 80 to 100 mph. Contois turned onto Highway 65 and then 81st Avenue, entering the neighboring suburb of Spring Lake Park, where another police car joined the pursuit. Just over six minutes after Burch entered the chase, Contois ran a red light and collided with a pickup truck driven by Helseth. The crash killed Helseth's passenger, seriously injured three juvenile passengers in Contois's car, and left Helseth a quadriplegic. Contois was tried and convicted of third degree murder and other offenses in state court.

Helseth filed this § 1983 damage action against Burch, alleging numerous constitutional violations arising from Burch's high-speed pursuit of Contois's vehicle. After substantial discovery, Burch moved for summary judgment. The district court dismissed all but Helseth's substantive due process claim. As to that claim, applying Feist, the court denied Burch qualified immunity because the evidence could support a finding that Burch conducted the pursuit with deliberate indifference to public safety and Helseth's rights. Alternatively, applying Lewis, the court denied Burch qualified immunity because the evidence could support a finding that Burch intended to harm Contois and his passengers by engaging in the PIT maneuvers. Burch appeals the denial of qualified immunity. As Lewis makes clear, in considering the qualified immunity defense, we must "determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." 523 U.S. at 841 n.5. That is an issue we review *de novo*. Elder v. Holloway, 510 U.S. 510, 516 (1994).

## II. The Proper Culpability Standard.

Lewis reaffirmed that the substantive component of the Due Process Clause protects a private citizen against an abuse of power by an executive official that "shocks the conscience." Lewis involved a § 1983 damage claim by a motorcycle

-3-

passenger injured at the end of a deputy sheriff's high-speed chase. The Ninth Circuit reversed the grant of summary judgment to the deputy, concluding that "the appropriate degree of fault to be applied to high-speed police pursuits is deliberate indifference to, or reckless disregard for, a person's right to life and personal security." Lewis v. Sacramento County, 98 F.3d 434, 441 (9th Cir. 1996). The Supreme Court reversed. The Court explained that the task was to determine the level of culpability which *in this context* "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." 523 U.S. at 848 n.8 & 849. For high-speed police pursuits, the Court rejected the deliberate indifference standard, which it characterized as a "midlevel" fault standard. Analogizing such pursuits to prison riots, the Court concluded that "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." 523 U.S. at 836.

Feist involved a high-speed police chase that ended when the stolen car being pursued hit Feist's vehicle head-on at 100 mph. Eschewing the intent-to-harm standard of Lewis, our panel affirmed the denial of qualified immunity to the pursuing police officer, concluding that the deliberate indifference standard applies to a high-speed pursuit case if the pursuing police officer "had ample time to deliberate . . . [and] made a deliberative decision to continue the chase and to be indifferent to the dangers obviously inherent in his conduct." 222 F.3d at 464. In this case, the district court concluded that the deliberate indifference standard should apply because Burch, like the police officer in Feist, "engaged in conscious deliberation rather than reflexive conduct." Helseth, 109 F. Supp. 2d at 1076.

Our principal problem with the decision in Feist is that the panel paid too little heed to the Supreme Court's *holding* in Lewis, instead relying primarily on a portion of the Court's justification for that holding. The Court in Lewis was careful to state its holding in the first paragraph of the opinion -- "in a high-speed automobile chase aimed at apprehending a suspected offender . . . only a purpose to cause harm unrelated to the

-4-

legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a [substantive] due process violation." 523 U.S. at 836. The Court restated its categorical rule toward the end of its opinion -- "we hold that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." Id. at 854. For the lower federal courts, an explicit Supreme Court holding is like a statute in that its plain language must be obeyed. Accord Kinstler v. First Reliance Std. Life Ins. Co., 181 F.3d 243, 250-51 (2d Cir. 1999). Lewis plainly stated that the intent-to-harm standard, rather than the deliberate indifference standard, applies to *all* high-speed police pursuits aimed at apprehending suspected offenders.[2]

To be sure, the Court in Lewis explained that the deliberate indifference standard is appropriate "only when actual deliberation is practical." 523 U.S. at 851. The panel in Feist saw this language as an invitation to reject intent-to-harm as the governing standard whenever a judge or a jury could say, with the wisdom of hindsight, that an officer engaged in a high-speed pursuit had "ample time to deliberate." But this reasoning not only produces a standard that eviscerates the holding of Lewis, it also gives too little recognition to the Court's other bases for that holding -- its historical reluctance "to expand the concept of substantive due process," 523 U.S. at 842; its explicit reliance on Whitley v. Albers, 475 U.S. 312, 320 (1986), which adopted the intent-to-harm standard for a two-hour prison riot, 523 U.S. at 853-54; its doubt

---

[2]Six Justices joined Justice Souter's majority opinion in Lewis. Justice Stevens concurred in the judgment because he would have granted the deputy qualified immunity, thereby avoiding the constitutional issue. 523 U.S. at 859. Justices Scalia and Thomas concurred in the judgment because they would have rejected the shocks-the-conscience standard and held that there is no "substantive-due-process right to be free from reckless police conduct during a car chase." 523 U.S. at 863. Given this array of views and the clarity of the Court's holding, we find no basis to infer that a majority of the Court would now retreat from Lewis's bright-line standard and adopt the fact-intensive, hindsight-oriented approach of the panel in Feist.

whether "it makes sense to speak of indifference as deliberate in the case sudden pursuit," 523 U.S. at 851; its recognition that police officers confronting high-speed lawlessness are "subject to countervailing [law] enforcement considerations," 523 U.S. at 855; its concern that any standard less than intent-to-harm "might cause suspects to flee more often, increasing accidents of the kind which occurred here," 523 U.S. at 858 (Kennedy, J., concurring); and the belief of at least some Justices that the question of police officer liability for reckless driving during high-speed pursuits should be decided by the elected branches of government, 523 U.S. at 864-65 (Scalia, J., concurring).[3]

Since Lewis, all other circuits that have examined the issue have applied the intent-to-harm standard in high-speed police pursuits cases, without regard to the potentially limiting factors identified by the panel in Feist -- the length of the pursuit, the officer's training and experience, the severity of the suspect's misconduct, or the perceived danger to the public in continuing the pursuit. See Trigalet v. City of Tulsa, 239 F.3d 1150, 1155 (10th Cir. 2001); Davis v. Township of Hillside, 190 F.3d 167, 170 (3d Cir. 1999), cert. denied, 528 U.S. 1138 (2000); Onossian v. Block, 175 F.3d 1169, 1171-72 (9th Cir.), cert. denied, 528 U.S. 1004 (1999); Salamacha v. Lynch, 1998 WL 743905, at *2 (2d Cir. Sept. 25, 1998). We now join those circuits and overrule Feist. We hold that the intent-to-harm standard of Lewis applies to all § 1983 substantive due process claims based upon the conduct of public officials engaged in a high-speed automobile chase aimed at apprehending a suspected offender.

### III. Did Officer Burch Intend To Harm?

Although we overrule Feist, we agree with its decision "that the Lewis intent standard applies regardless of whether a suspect or bystander is hurt." 222 F.3d at 462.

---

[3]Under Minnesota law a police officer has official immunity from claims for injuries caused by his or her decision to engage in and continue a high-speed pursuit. Pletan v. Gaines, 494 N.W.2d 38, 41 (Minn. 1992).

Accord Onossian, 175 F.3d at 1171-72. The district court denied Burch summary judgment under the intent-to-harm standard because Burch's deliberate ramming of Contois's vehicle in four PIT maneuvers would permit a reasonable jury to "infer from these facts that Burch intended to harm Contois and the three juvenile passengers in his car." 109 F. Supp. 2d at 1077.

The district court's decision conflicts with Davis v. Township of Hillside, 190 F.3d at 171, where the Third Circuit concluded that deliberate ramming of a fleeing suspect's car "does not permit an inference of intent to harm" under Lewis. We agree with the decision in Davis. In applying the Lewis standard, "only a purpose to cause harm *unrelated to the legitimate object of arrest* will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." 523 U.S. at 836 (emphasis added). Here, the undisputed evidence is that Burch employed the PIT maneuvers in an attempt to stop the fleeing Contois vehicle and apprehend its driver. The only harm intended by this conduct was incidental to Burch's legitimate objective of arresting Contois. That intent does not, as a matter of law, establish a substantive due process violation.[4]

Moreover, the PIT maneuvers failed in their objective, and Contois continued his high-speed flight. Contois eventually crashed into Helseth's vehicle, with Burch still in pursuit. At that time, Burch had no more intent to harm than that inherent in the high-speed pursuit of any suspected offender. On appeal, Helseth points to Contois's deposition testimony that he felt terrorized by Burch's aggressive pursuit and argues that this case is like Checki v. Webb, 785 F.2d 534 (5th Cir. 1986), which the Court

---

[4]Had Burch succeeded in stopping the Contois vehicle, his actions in effecting such a seizure would have been subject to a reasonableness challenge under the Fourth Amendment. See Brower v. County of Inyo, 489 U.S. 593, 599-600 (1989). But Contois eluded arrest and resumed his flight. A § 1983 claim challenging Burch's continued pursuit must be based upon substantive due process. See Lewis, 523 U.S. at 842-45 & n.7.

in <u>Lewis</u> cited as an example of intent to cause harm unrelated to the legitimate object of an arrest. 523 U.S. at 854 n.13. But unlike the law-abiding citizens in <u>Checki,</u> who were hounded for miles by police officers in an unmarked vehicle, Contois was a fleeing criminal, whose irresponsible high-speed driving endangered countless citizens and ultimately killed one innocent bystander and maimed another, Timothy Helseth. Burch and the other police officers who risked their lives to remove this menace from the public highways were not guilty of a conscience-shocking intent to harm.

Society could reasonably decide that an innocent bystander injured during such high-speed police pursuits should be compensated from the public coffers. But that is a legislative decision. There was no violation of Helseth's rights under the Due Process Clause. The August 18, 2000, order of the district court is reversed in part, and the case is remanded for entry of an order dismissing Helseth's § 1983 complaint.

McMILLIAN, Circuit Judge, dissenting.

I join in Part II of Judge Bye's opinion concurring in part and dissenting in part, because, assuming for purposes of analysis that the Supreme Court adopted a per se rule in <u>County of Sacramento v. Lewis</u>, 523 U.S. 833 (1998) (<u>Lewis</u>), I agree that there was sufficient evidence of intent to harm to defeat the motion for summary judgment on the basis of qualified immunity. I also agree with Judge Bye's comments criticizing the <u>Lewis</u> analysis, but I write separately to explain why I do not agree that the Supreme Court adopted a per se rule in <u>Lewis</u>, and why I think that the old axiom that hard cases sometimes make bad law applies to the difference between the majority opinion and the earlier panel opinion in <u>Feist v. Simonson</u>, 222 F.3d 455 (8th Cir. 2000) (<u>Feist</u>). The result is that the majority has created dangerous precedent whereby future courts applying the rule of this case have no choice but to blindly apply a rule of law without regard to the facts.

Unfortunately, the two senior judges who sat on <u>Feist</u> did not have an opportunity to hear this case argued because the en banc panel involved only active judges. My main concern relates to the statement of the majority opinion that the panel in <u>Feist</u> paid too little heed to the Supreme Court's holding in <u>Lewis</u>, and instead relied primarily on "a portion of the Court's justification for that holding." <u>See supra</u> p. 5. Although I am not sure exactly what the latter phrase means, to hold that the panel in <u>Feist</u> paid too little heed to the Supreme Court's holding in <u>Lewis</u> totally obfuscates an analytical reading of the <u>Feist</u> opinion.

The majority opinion extracts from <u>Lewis</u> a categorical rule that once an officer instantaneously engages in a high-speed automobile chase of a suspected criminal–regardless of what intervenes after the instantaneous pursuit–no substantive due process violation occurs absent intentional harm. <u>See supra</u> pp. 5-6 & note 2. <u>Feist</u> took the position that the <u>Lewis</u> Court did not intend to create a mechanical rule to be applied blindly, and that intervening acts, such as egregious acts beyond instantaneous reactions, that is, when actual deliberation is practical, could warrant the application of the deliberate indifference standard. 222 F.3d at 461. <u>Lewis</u> says exactly that. 523 U.S. at 851.

Justice Souter's thorough examination of this issue clearly denounces applying the <u>Lewis</u> holding "like a statute in that its plain language must be obeyed." <u>See supra</u> p. 5. Nevertheless, the majority opinion interprets <u>Lewis</u> to say that "the intent-to-harm standard, rather than the deliberate indifference standard, applies to <u>all</u> high-speed police pursuits aimed at apprehending suspected offenders." <u>See supra</u> p. 5 (emphasis added). One must give the Supreme Court greater credibility than simply applying <u>Lewis</u>, absent an evaluation of the facts of a given case.

Every principle of law turns upon the factual background of the given case. To hold otherwise ignores Justice Souter's admonition in <u>Lewis</u>:

Rules of due process are not, however, subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking. What we have said of due process in the procedural sense is just as true here:

> The phrase [due process of law] formulates a concept less rigid and more fluid that those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.

523 U.S. at 849, citing Betts v. Brady, 316 U.S. 455, 462 (1942).

Clearly, the "exact analysis of circumstances" in a given case requires more than rubber-stamping a particular rule of law. To suggest the Supreme Court endorsed such a mechanical approach in Lewis fails to give any sense of jurisprudential credit to the highest court of the land. Lewis requires that we apply the "exact analysis" of "the totality of facts in a given case." The holding in Lewis may deny recovery as to the high-speed chase involved in this case. However, Feist is clearly distinguishable from both this case and Lewis.

As the panel in Feist explained, what began as an instantaneous pursuit by Officer Simonson in a high-speed chase changed significantly along the way. The Feist panel placed great reliance upon the specific findings of fact made by the district judge:

-10-

[w]hile Officer Simonson should be afforded deference for his initial decision, the contention that he did not have the time or ability to clearly assess the rising levels of potential danger in the situation should be subject to further analysis.  At many points during the chase, Simonson had the opportunity to balance the law enforcement goal of apprehending Shannon for use of a stolen vehicle (a low-level penalty likely carrying no prison time) against the threat to the general public.  Each new turn onto one-way streets and especially the accessing the freeway to drive on the wrong side of the median, presented a juncture for reassessment and evaluation of the escalating consequences of the chase.  Rather than aborting the chase as the danger increased, the speed and number of pursuing vehicles also increased. . . . A review of Simonson's conduct, in light of Lewis and other established precedent, reveals that genuine issues of fact exist as to whether his actions "shocked the conscience" for the purpose of a substantive due process claim.

Mem. op. and order at 18-19 (emphasis added), cited in Feist, 222 F.3d at 461.  Those findings of fact should not and cannot be set aside unless they are clearly erroneous.  In Feist no one argued that the district judge's findings were clearly erroneous.

In Lewis the high-speed chase involved seventy-five seconds.  In Feist it extended over six minutes.  The majority opinion in overruling Feist ignores the fact that Officer Simonson made a conscious decision to pursue the driver of the fleeing vehicle and follow it at speeds of seventy miles per hour, traveling the wrong direction down Interstate Highway I-94, covering 1.2 miles, as well as pursuing the fleeing automobile the wrong way down several one-way streets. Each time Simonson pursued on a one-way street, he deliberately chose to use the on-coming vehicles as a moving blockade against the fleeing juveniles.  Simonson had been trained by the Minneapolis Police Department not to duplicate the path of the fleeing driver, not to chase when to pursue would put the public in danger and to reflect upon the wisdom of each escalation of the pursuit.  Notwithstanding such training, Simonson deliberately chose to increase the danger to the public.  Simonson proceeded in deliberate disregard of that training.

In addition to eschewing the egregious conduct of Officer Simonson, the majority opinion here did not examine the testimony in <u>Feist</u>. Other officers testified at trial that Simonson had created an unreasonable risk of danger to the public by pursuing the fleeing vehicle and driving through the I-94 tunnel the wrong way. This compelling evidence supported the district court's conclusion that "Simonson's instinctive decision to give chase slowly escalated into a high-speed chase involving wrong-way travel, thereby increasing the potential for harm to the general public." 222 F.3d at 461.

In conclusion, let me say that in <u>Feist</u> the unconstitutional action of Officer Simonson was not based upon his initial decision to pursue the fleeing vehicle (indeed, <u>Feist</u> agreed with the district court that the instantaneous judgment and reaction were fully justified, <u>see id.</u> at 461, 464), but upon the intervening facts, the most significant of which was Simonson's decision, after actual deliberation, to pursue the fleeing vehicle the wrong way on one-way streets and onto the interstate highway, through a darkened tunnel, into oncoming traffic. <u>See id.</u> at 464.

If the majority opinion's interpretation of <u>Lewis</u> is that no high-speed pursuits by police officers, regardless of intervening events, including actual deliberation, provide a substantive due process claim absent intent to cause harm, then obviously <u>Feist</u> was wrongly decided. However, the panel in <u>Feist</u> rejected a mechanical application and instead, followed <u>Lewis</u>'s mandate to perform an exact analysis of the totality of facts in a given case. <u>Feist</u> was based upon the principles set out in <u>Lewis</u>. The majority opinion states that <u>Feist</u> should be overruled because it ignored <u>Lewis</u>. A fair reading of <u>Feist</u> would dictate that the mechanical application of <u>Lewis</u> to all high-speed police chases misreads <u>Lewis</u>.

BYE, Circuit Judge, concurring in part and dissenting in part, and with whom McMILLIAN, Circuit Judge, joins in Part II.

I reluctantly concur in Part II of the majority's opinion because I agree that County of Sacramento v. Lewis, 523 U.S. 833 (1998), requires a § 1983 plaintiff to satisfy the "intent to harm" standard in any high speed pursuit case; I write separately to explain why I believe the "deliberate indifference" standard would be more appropriate in many high speed pursuit cases. I respectfully dissent from Part III of the majority's opinion, however. I believe that Timothy Helseth survives summary judgment even when applying the higher "intent to harm" standard required by Lewis.

I

Lewis rests upon the premise that trained officers are unable to deliberate during the course of a high speed pursuit, no matter its duration. I question that premise. Behavioral and tactical training enables officers (particularly those who have been involved in many high speed chases, such as John Burch) to process the events in a rapidly-evolving situation as if they occurred at a more deliberate pace. In this respect, officers are analogous to professional athletes who study film and plot gameplans to "slow" the speed of a game, enabling them to understand and react instantaneously to complex, changing circumstances. Because police officers are regularly trained to adjust to fast-paced situations, we must expect that their conduct will usually be deliberate — despite the pace at which events occur to the untrained eye. Lewis suggests that we can't expect officers to think while they act, a proposition that might offend every well-trained officer in this country.

The facts of this case, as well as those in Feist v. Simonson, 222 F.3d 455 (8th Cir. 2000), prove my point. In this case, the City of Blaine's police department regulations on high speed pursuits *required* officers to make conscious deliberations during the course of a chase:

Officers involved in a pursuit *must continually question* whether the seriousness of the violation reasonably warrants continuation of the

-13-

pursuit. A pursuit shall be discontinued when there is a clear danger to the pursuing officers or the public. . . . The pursuing officers *must consider* present danger, seriousness of crime, length of pursuit, whether or not the application of deadly force by the pursuing Officer is justified, and the possibility of identifying the suspect at a later time when determining whether or not to continue the pursuit.

App. at 333 (emphasis added).

Indeed, Officer Burch *admitted* that he had time to deliberate during the pursuit:

Q.   But the policy and your training and your experience teach you to think about what you are doing in a high speed pursuit and whether the risk of the pursuit is worth the apprehension, correct.
A.   Sure.
Q.   And that is not just supposed to be a reflex, that is supposed to be a thought process, correct.
A.   Sure.
Q.   And you had time to make decisions about what tactics to use in the chase, correct?
A.   Sure.
Q.   You had time to consider whether you would try one type or another of ramming maneuvers, correct?
A.   Sure.

        . . . .

Q.   You had time to consider the mechanical damage that you had done to the vehicle.
A.   That is correct.

        . . . .

Q.   You had time to consider whether to continue the chase into another police jurisdiction.

-14-

A.    That is correct.

Id. at 480-82.

Similarly, Feist involved an officer who had participated in over one hundred high speed chases who "[a]t many points during the chase [of extended duration] had the opportunity to balance the law enforcement goal of apprehending [the suspect] for use of a stolen vehicle (a low-level penalty likely carrying no prison time) against the threat to the general public." 222 F.3d at 461.

Because I believe that officers deliberate in most pursuits, I am frustrated by our inability to assess, on a case-by-case basis, whether the "deliberate indifference" standard should apply to a particular high speed pursuit.  In adopting the "intent to harm" standard, the Supreme Court compared an officer's ability to deliberate during a high speed chase with that of a prison official responding to a riot.  See Lewis, 523 U.S. at 852-53 (discussing Whitley v. Albers, 475 U.S. 312 (1986)). I find that comparison unhelpful. "[O]ur concern with preserving the constitutional proportions of substantive due process *demands an exact analysis of circumstances*" before deciding what shocks the conscience.  Id.  at 850 (emphasis added).  One's conscience may not be shocked by deliberate indifference to rioting prisoners.  But in assessing the exact circumstances involved in a high speed pursuit of extended duration, an officer's deliberate indifference to the rights of innocent motorists and bystanders may very well shock the conscience.

Furthermore, the "intent to harm suspects" standard adopted by the Supreme Court fits ill with the type of § 1983 claim involved here — that of an innocent motorist injured as the result of a high speed pursuit.  Oddly, under the Supreme Court's test, an innocent motorist need not prove that an officer intended to harm *him*, but that the officer intended to harm a *suspect*.  Why are we concerned with an officer's intent to

-15-

harm a suspect, a juror might wonder, when the innocent motorist's constitutional rights are at stake? The "deliberate indifference" test is more compatible with the § 1983 claim of an innocent motorist, who would then be required to prove deliberate indifference to his own constitutional rights.

For the reasons stated by the majority, however, I agree that the Supreme Court held that § 1983 claimants must satisfy the heightened, intent-to-harm standard in all high speed pursuit cases. Thus, irrespective of my differing views on a well-trained officer's ability to deliberate, I turn my attention to Mr. Helseth's proof that Officer Burch intended to harm nineteen year-old Everett Contois, the fleeing suspect in this case.

II

Helseth introduced substantial evidence tending to prove that Burch intended to injure Contois. Burch purposefully placed himself in a position to take over as the lead pursuer in an ongoing chase. App. at 345. He chased the fleeing vehicle at extremely high speeds, between 80 and 100 miles per hour. Id. at 349. He chased the vehicle over a retaining wall, plowing through several residential backyards in the dark of night, within feet of trees, patios, and occupied homes. Id. at 342-44, 463-68. Officer Bott, the original officer, terminated the chase after the suspect vehicle drove into residential backyards; but Burch continued the pursuit for an extended period of time after that. Id. at 287, 291, 341 349.

Most significantly, on four occasions Burch consciously employed PIT maneuvers to intentionally ram the suspect vehicle. Id. at 49, 345-46, 440-42, 471. The City of Blaine's police department regulations proscribe PIT maneuvers except in the most extreme circumstances. Id. at 330. PIT maneuvers are considered to be deadly force when used on a vehicle moving at high speeds ("intentional ramming

causes the high probability of serious injury or death"). Id. Based on the Blaine regulations, as well as his training, Burch knew or should have known that intentional officer-initiated contact with a high speed vehicle was considered the use of deadly force. Id. at 46-49.

Under these circumstances, Officer Burch's conduct shocks the conscience. He knowingly and deliberately used deadly force against a suspect whose only known offenses were *misdemeanors* — speeding and fleeing a police officer. Officer Burch could have terminated this chase after he identified the vehicle's license plate[5] so that he or other officers could subsequently have investigated the matter. Instead, Burch continued a chase that ultimately produced the death and paralysis of innocent motorists, and the incarceration of Contois for eighteen years for third-degree murder.

Officer Burch's conduct would shock the conscience even if we knew nothing else about him. But we do. Helseth contends that Burch is that rare "rogue cop" who enjoys nothing more than the thrill of the chase. Burch's pre- and post-incident record strongly suggests that to be true. Burch was involved in multiple police vehicle collisions or accidents (several involving the intentional ramming of suspect vehicles) both before and after the Contois pursuit. App. at 239-48, 527, 547-56. He was disciplined on several occasions for his "maverick behavior" and failure to adhere to department policies and procedures (including frequent driving violations). Id. at 529-44.

During a 1989 disciplinary proceeding, Officer Burch stated "if I have to answer a call and concern myself with car safety, then people are going to die," leading the police chief to retort "[Burch] overlooks the fact that someone could die as a result of

---

[5]Burch denied that he had identified the vehicle's license plate until he was confronted with his own voice, identifying the plate, on a tape recording of the radio transmissions during the chase. Supp. Jt. App. at A-2, A-3.

*his* unsafe driving." Id. at 529 (emphasis added). During a 1994 disciplinary proceeding, an arbitrator commented that "[t]he City suggests it has repeatedly attempted to reconcile [Burch's] maverick behavior through a variety of disciplinary actions but he fails to admit fault or demonstrate remorse." Id. at 538.

My concerns are somewhat alleviated by the fact that Burch decided to retire from the Blaine Police Department sometime after the City suspended him for unreasonably using deadly force by performing an unnecessary PIT maneuver in yet another high speed chase. In February 1998, Burch drove one of four squad cars (two from the City of Blaine and two from the City of Coon Rapids) involved in a high speed pursuit. Burch lost his spot in the chase when he struck the other Blaine squad car. The two Coon Rapids squads took over the chase. The suspect vehicle blew a tire, slowing to 40-50 miles per hour. By the time Burch had closed on the slowing pursuit, the suspect vehicle was pulling over and traveling about 5-10 miles per hour. Nonetheless, Burch radioed ahead his intention to ram the vehicle, sped between the two Coon Rapids squad cars, and intentionally rear-ended the slow-moving suspect vehicle. Id. at 552-56.

In Lewis, the Supreme Court stated that "only a purpose to cause harm *unrelated to the legitimate object of arrest* will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation [in a high speed chase]." 523 U.S. at 836 (emphasis added). The majority concludes that we cannot infer intent to harm from Burch's intentional ramming because "[t]he only harm intended by this conduct was incidental to Burch's legitimate objective of arresting Contois." *Ante* at 7. I strongly disagree.

"[T]he mere fact that force may have been used while effectuating an arrest does not automatically establish that the force was 'in relation' to a *legitimate object* of the arrest under a § 1983 analysis." Davis v. Township of Hillside, 190 F.3d 167, 172 (3d

-18-

Cir. 1999) (McKee, J., concurring) (emphasis added). I cannot view Burch's abuse of executive power as incidental to a *legitimat*e law enforcement objective. Officer Burch's use of deadly force against a fleeing misdeameanant constituted a completely unreasonable use of force in violation of clearly established law. See Tennessee v. Garner, 471 U.S. 1, 12 (1985) (noting a flat prohibition against the use of deadly force upon a fleeing misdemeanant, stemming from English common law and adopted by most American jurisdictions); Minn. Stat. § 609.066 (prohibiting the use of deadly force to prevent escape unless "the peace officer knows or has reasonable grounds to believe [the suspect] has committed or attempted to commit a *felony* involving the use or threatened use of deadly force [or] the officer knows or has reasonable grounds to believe [the suspect] has committed or attempted to commit a *felony* if the officer reasonably believes that the person will cause death or great bodily harm if the person's apprehension is delayed.") (emphasis added).

In addition, I believe that Burch's intentional ramming of a fleeing *misdemeanant's* vehicle amounts to the same level of terrorizing conduct involved in Checki v. Webb, 785 F.2d 534 (5th Cir. 1986).[6] The Supreme Court referred to Checki

---

[6]Contois described his state of mind after the ramming started as follows:

The chase started out the guy was just chasing me, all right, then this other guy shows up on the scene and he just started ramming me . . . as soon as I came around the corner he hit me again and he hit me again and hit me again and he hit me, went the wrong way and he hit me again . . . he hit me down the road and he hit me in the ditch and he hit me there and he hit me here.

. . .

I realize that I was success[fully] speeding, but I would assume that the original officer chasing me realized that I wasn't intentionally endangering anybody else. Every time there was a stoplight . . . my brake lights would

when, by negative implication, the Court recognized a redressible § 1983 action in situations when an officer intends "to worsen [a suspect's] legal plight." Lewis, 523 U.S. at 854 & n.13. One can hardly dispute that Contois's legal plight worsened as this chase progressed. A fleeing misdemeanant at the start of the chase, he was a murderer at its end.

The district court correctly concluded that Burch unreasonably used deadly force in violation of clearly established law, and that a reasonable jury could infer from Burch's conduct that he "intended to harm Contois and the three juvenile passengers in his car." Helseth v. Burch, 109 F. Supp. 2d 1066, 1077 (D. Minn. 2000). I would

---

come on and I take off again when I saw him and kind of like a cat and mouse kind of thing . . . He saw me again, better take off again. . . . It wasn't like a terrifying situation . . . you are looking out . . . for cars . . . for people. But when all of a sudden it goes from . . . not just a cat and mouse thing anymore, it's a tiger and a mouse and this guy is going to get you no matter what it takes, so now you are really trying to get away. Before you were trying to elude, maybe hide and pull up in a driveway and shut your lights off so he drives by. But when they start ramming into your car, you don't have that option. You don't have the option of getting out and running when he is ramming into you. You figure if you do get out, he's going to shoot you so you just keep trying to get away.

. . .

When people say I'm crazy because I thought there that they were trying to kill me, if you read police procedures that [ramming] is considered deadly force. Basically they are trying to kill you. That is not — well, let's just do this, no, let's try to kill this guy so he stops. So I don't think that my state of mind after being rammed was too far off base.

App. at 272-76.

therefore affirm the district court's denial of Burch's motion for summary judgment on the basis of qualified immunity.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.